HAIRSTON v FIRESTONE TIRE & RUBBER COMPANY

Docket Nos. 58856, 58958. Argued December 7, 1977 (Calendar Nos. 11, 12).—Decided December 27, 1978.

David Hairston was awarded concurrent workers' compensation benefits by the Workmen's Compensation Appeal Board against his employers, Firestone Tire & Rubber Company and Ford Motor Company, and Firestone's insurer, Liberty Mutual Insurance Company. The plaintiff worked at two full-time jobs for 16 years and the appeal board found that both jobs had aggravated his heart condition, which was discovered after a medical examination in 1971. Defendant was discharged from his employment at Firestone after the discovery of his heart condition but continued to work at Ford until he suffered a heart attack and collapsed in March 1972. The Workmen's Compensation Appeals Board ordered defendant Firestone to pay total disability benefits from the last date plaintiff worked for Firestone until further order and defendant Ford to pay from March 1972 until he returned to "favored work" at Ford in 1973. The appeals of the defendants were consolidated and the Court of Appeals, R. M. Maher, P.J., and D. C. Riley and R. M. Ryan, JJ., affirmed in an unpublished per curiam opinion (Docket Nos. 24994, 25910, 26291). Defendants appeal. *Held:*

1. The Workmen's Compensation Appeal Board properly found that the plaintiff was totally disabled in 1971 by a "personal injury" at Firestone Tire & Rubber Company because the heavy work which the plaintiff performed for defendant Firestone accelerated the progression of his pre-existing heart condition. The plaintiff usually worked for Firestone as a tire changer, working mostly with truck tires which averaged 200 pounds, in the store and on the road. He also lifted tires, home appliances and power lawn mowers. His disability was shown to

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 9] 82 Am Jur 2d, Workmen's Compensation §§ 340, 408, 507.
[3, 5, 7] 82 Am Jur 2d, Workmen's Compensation § 373.
[4] 82 Am Jur 2d, Workmen's Compensation § 364.
[6] 81 Am Jur 2d, Workmen's Compensation §§ 3, 5.
  82 Am Jur 2d, Workmen's Compensation § 407.
[8] 82 Am Jur 2d, Workmen's Compensation §§ 347, 348.

be due to "causes and conditions which are characteristic of and peculiar to the business" of defendant Firestone.

2. The Workmen's Compensation Appeal Board also properly found that the plaintiff was totally disabled from a "single-event" injury in 1972 at defendant Ford Motor Company while he was turning a 2000-pound floor scrubbing machine in a small area. The plaintiff had trouble breathing, felt weakened and then "blacked out". He was taken to Ford's first-aid station and spent five days in a hospital.

3. The Court does not recognize the "similarity test" that earnings in concurrent employments may be considered as a unit to establish a claimant's wage-earning capacity if the employments are related or similar. The Workmen's Compensation Appeal Board found as a matter of fact that the plaintiff in the instant case had two separate earning capacities, had worked two full-time jobs for 16 years, and suffered two separate injuries. The defendants are in no worse position than if each had hired a different employee with a heart condition. The plaintiff is not reaping a windfall because he has received two injuries, each of which resulted in the loss of his two wage-earning capacities. The plaintiff is entitled to two whole awards of workers' compensation, one from each of his employers.

Justice Coleman, with Justice Fitzgerald, would also affirm the judgment of the Court of Appeals, but for different reasons than those given by the Court of Appeals and the Workmen's Compensation Appeal Board:

1. The plain wording of the statute must be given meaning. Workmen's compensation benefits should be available for the effects of an occupational accident without consideration of the benefits being provided (or available) as a result of a different occupational accident, unless compelled by the set-off provision of the statute. The maximum limits of the workmen's compensation benefits available for total or partial disability should be applied only to the results of each specific occupational accident.

2. The use of the concept of "wage-earning capacity" as an analytical tool in cases where a claimant suffers separate injuries in concurrently held employments is abandoned. To the extent that prior decisions are inconsistent with this opinion, they are overruled. The only utility in distinguishing between plaintiffs on the basis of wage-earning capacity is to avoid the harsh rule of previous decisions that the aggregate amount of workmen's compensation benefits receivable in any period of time, regardless of the number of separate disabling injuries

arising from different occupational accidents, was limited by the statutory maximums.

3. Each employer is statutorily liable for the incapacity to work and earn wages caused by an occupational injury. There is no legislatively created mechanism for limiting the benefits the plaintiff would receive from defendant Ford because he was previously entitled to receive workmen's compensation from defendant Firestone. Furthermore, there is nothing in the statutory provisions which even suggests that results would vary depending upon the "wage-earning capacity" of the plaintiff.

4. The Worker's Disability Compensation Act contemplates that a worker should receive compensation for the impairment of future earning capacity occasioned by an occupational injury. Actual wage loss is used as the gauge of impairment of earning capacity. The plaintiff has suffered two injuries and has lost two separate parts of his established earning capacity. The statutory provisions setting the amount of workmen's compensation payable refer to "the injury" for which "the employer" shall provide compensation. There is no reference to the results of other occupational injuries.

5. The Workmen's Compensation Appeal Board found that the plaintiff suffered a distinct job-related injury in each concurrently held employment. Such findings of fact are binding upon the courts in the absence of fraud. The decisions of the Court of Appeals and Workmen's Compensation Appeal Board are affirmed as to result. The rule of this decision shall be applied prospectively to all cases commenced after this case is decided and to cases on appeal in which the issue has been preserved.

The decision of the Court of Appeals is affirmed.

### OPINION OF THE COURT

1. WORKMEN'S COMPENSATION — TOTAL DISABILITY — CONCURRENT EMPLOYMENT — HEART CONDITION.

The Workmen's Compensation Appeal Board properly found that a worker who had worked two full-time jobs for 16 years was totally disabled by an injury at both of the jobs where the record shows that the heavy work which the worker performed for one employer had accelerated the progression of a preexisting heart condition; the disability was shown to be due to "causes and conditions which are characteristic of and peculiar to the business" of that employer; and the appeal board found

that the worker suffered a separate injury from a heart attack on the other job (MCL 418.401[c]; MSA 17.237[401][c]).

2. WORKMEN'S COMPENSATION — TOTAL DISABILITY — CONCURRENT EMPLOYMENT — HEART CONDITION.

The Workmen's Compensation Appeal Board properly found that a worker, who had worked two full-time jobs for 16 years and was found to be totally disabled because of a heart condition which was aggravated by one job, was also totally disabled by a separate "single-event injury" (a heart attack) on the other job after he left the first job.

3. WORKMEN'S COMPENSATION — TOTAL DISABILITY — CONCURRENT EMPLOYMENT — WAGE EARNING CAPACITY.

The Supreme Court does not recognize the "similarity test" that earnings in concurrent employments may be considered as a unit to establish a claimant's wage-earning capacity if the employments are related or similar.

DISSENTING OPINION BY COLEMAN, J.

4. WORKMEN'S COMPENSATION — CONCURRENT EMPLOYMENT — BENE-FITS.

*Workmen's compensation benefits are available for the effects of an occupational accident without consideration of the benefits available as a result of a different occupational accident, unless consideration of other benefits is compelled by the set-off provision of the statute (MCL 418.351, 418.361, 418.371[1]; MSA 17.237[351], 17.237[361], 17.237[371][1]).*

5. WORKMEN'S COMPENSATION — CONCURRENT EMPLOYMENT — WAGE EARNING CAPACITY.

*The case-law concept of a claimant's wage-earning capacity in concurrent employments is abandoned as an analytical tool for determining the amount of workmen's compensation benefits to which he is entitled for multiple injuries (MCL 418.351, 418.361; MSA 17.237[351], 17.237[361]).*

6. WORKMEN'S COMPENSATION — CONCURRENT EMPLOYMENT — BENE-FITS.

*The plain words of the Worker's Disability Compensation Act provide that each employer is statutorily liable for an injured employee's incapacity to work and earn wages caused by an occupational injury (MCL 418.351, 418.361; MSA 17.237[351], 17.237[361]).*

7. Workmen's Compensation — Concurrent Employment — Benefits.

    *There is no legislatively created mechanism for limiting the benefits a claimant would receive from one employer because he was previously entitled to receive compensation from a concurrent employer for a different work-related injury (MCL 418.351, 418.361; MSA 17.237[351], 17.237[361]).*

8. Workmen's Compensation — Benefits — Wage Loss.

    *The Worker's Disability Compensation Act contemplates that a worker should receive compensation for the impairment of future earning capacity occasioned by an occupational injury; actual wage loss is used as the gauge of impairment of earning capacity (MCL 418.351, 418.361; MSA 17.237[351], 17.237[361]).*

9. Workmen's Compensation — Concurrent Employment — Heart Condition — Finding of Fact.

    *A finding of fact by the Workmen's Compensation Appeal Board that a worker, who had worked two full-time jobs for 16 years, suffered two distinct job-related injuries to his heart, one on each job, is binding upon appellate courts, in the absence of fraud (Const 1963, art 6, § 28; MCL 418.861; MSA 17.237[861]).*

*Kelman, Loria, Downing, Schneider & Simpson* (by *Donald W. Loria* and *Robert W. Howes)* for plaintiff.

*Ulanoff, Ross, Summer & LaKritz, P.C.,* for defendants Firestone Tire & Rubber Company and Liberty Mutual Insurance Company.

*Carl G. Meyers,* Senior Attorney *(Hayim I. Gross,* of counsel on appeal), for defendant Ford Motor Company.

Williams, J. This case involves a unique fact situation. For 16 years plaintiff David Hairston worked two concurrent full-time jobs. From 1955 until August 6, 1971 he worked at Firestone Tire & Rubber Company; from 1948 until March 2, 1972 he worked at Ford Motor Company. On August 6, 1971, Firestone told plaintiff he could no

longer work for Firestone because of a medical examination and report indicating that plaintiff had a heart condition. *Plaintiff continued working his full-time job at Ford until March 2, 1972, when he "blacked out" while at work.*

The issue in this case is whether the Worker's Compensation Appeal Board (the "WCAB") erred in ordering both Firestone and Ford to compensate plaintiff at the maximum rate for total disability under the Worker's Disability Compensation Act.

We hold that the WCAB did not err in its "dual" award of worker's compensation benefits to plaintiff. Accordingly, we affirm the decisions of the Court of Appeals and the WCAB.

I

The facts in this case are complicated and important, thereby necessitating a relatively lengthy exposition. The reason for this is the unique "dual nature" of plaintiff's employment and worker's compensation claims.

For 16 years plaintiff worked two full-time jobs.

From June 27, 1948 to March 2, 1972, plaintiff worked an average of over 40 hours per workweek for Ford Motor Company ("Ford").[1] From 1955 to August 1971, plaintiff worked a steady 48-hour week at Firestone Tire & Rubber Company ("Firestone").

The WCAB, looking to the record, accurately described the nature of plaintiff's employment at Ford as follows:

"For the first 10 to 12 years, he worked as a group

---

[1] During his first five years of employment at Ford, plaintiff worked seven days per week; thereafter, for six or seven years, he worked six days per week. By 1971 his workweek had been reduced to 40 hours per week.

two cleaner. The job involved moving heavy material, moving skids weighing 50 to 60 pounds, climbing ladders, and dusting in high places. Plaintiff was then switched to a classification as a group one cleaner. He indicated that this was supposed to be light work and that he was given strict orders to do all light work. However, the duties assigned to plaintiff were not all light, and plaintiff testified that he did what he was told to do. As a group one cleaner in the crash lab, plaintiff worked in both the office area and the shop area. He dusted anything within reach, emptied ashtrays, moved books, cleaned restrooms, and emptied wastebaskets. The wastebaskets were filled usually with IBM cards, and plaintiff estimated the filled weight to be approximately 50 pounds. Fifty to 60 wastebaskets were emptied each shift into bags which then had to be taken to a disposal area and thrown into the opening in the top of a dumpster which was 9 to 10 feet high. No ladder was available so that all items had to be thrown up and in. In addition, plaintiff was responsible for disposing of parts cut off automobiles being used in crash research. These included, each day, 5 to 6 car bumpers weighing 30-40 pounds, car doors, and smaller parts which had been thrown into three foot by four foot containers. The parts also had to be taken to the disposal area and had to be thrown into the dumpster. Plaintiff testified that the task he, personally, found most difficult was operating a 2000 pound Lincoln floor scrubbing machine. Plaintiff ran this machine in the shop area two to three days per week for about three hours each time. * * * Plaintiff testified that, in the crash lab, he had to maneuver the machine in the narrow aisleway between cars."

On March 2, 1972, while turning the Lincoln floor scrubbing machine in a small area, plaintiff had trouble breathing, felt weakened, and then "blacked out". He was taken to first aid and then to Oakwood Hospital, where he remained for five days. After this, plaintiff did not continue his employment at Ford; nor was he able to secure

employment elsewhere. On October 17, 1973, plaintiff returned to "favored work" at Ford.[2]

The WCAB, looking to the record, accurately described the nature of plaintiff's employment at Firestone as follows:

"* * * for most of the period of his employment at Firestone he was classified as a tire changer, working mostly with truck tires averaging approximately 200 pounds. He also changed bus and automobile tires, with the largest and heaviest tire being taller than he was at 5 foot 9 inches and weighing about 300 pounds and with the smallest tire weighing 25 to 30 pounds. Plaintiff changed tires both in the store and out on the road. In 1969, he apparently was assigned to spend more time in the store, and he changed fewer truck tires and more automobile tires. He also stacked tires, including truck tires, and unloaded and stacked stoves weighing 200 to 300 pounds and refrigerators weighing up to 600 pounds, as well as power lawn mowers."

Plaintiff last worked at Firestone on August 6, 1971. Before this date, plaintiff had gone to University Hospital in Ann Arbor for an examination of a heart condition.[3] Firestone requested a written report of this examination. After the report was received, plaintiff's supervisor at Firestone informed him that the physician who conducted his heart examination believed that plaintiff's heart was not strong enough to permit him to continue

[2] This is reflected in the record by stipulation entered by plaintiff and defendant Ford in June, 1975, subsequent to the WCAB opinion:

"It is hereby stipulated that David Hairston, appellee herein, returned to favored work on October 17, 1973, at which time he earned wages equal to or greater than he was earning on March 2, 1972, except for the period from November 5, 1973 through November 25, 1973, inclusive."

[3] Prior to 1971 (it is not clear from the record when), it was discovered that plaintiff had a heart condition. There is no evidence in the record that plaintiff lost any time at his work as a result of this.

working at his Firestone job. Consequently, plaintiff was told that Firestone could not continue to employ him because his job involved work which was too heavy for his heart condition.

Following his employment termination at Firestone, plaintiff continued to work at his full-time job at Ford until his heart attack on March 2, 1972.

In October 1971, plaintiff filed a claim for workmen's compensation benefits against Firestone and Ford. In March 1972, plaintiff amended his petition against Ford, alleging a personal injury which occurred "on or about March 2, 1972". In January 1973, the hearing referee found that plaintiff had become disabled on August 6, 1971, as the result of the aggravation of a pre-existing heart condition by the work plaintiff performed for defendant Firestone. The referee also found that on March 2, 1972, plaintiff was disabled by an "underlying heart condition" which caused a "specific stress or injury". The referee awarded plaintiff the maximum compensation ($102) for total disability against defendant Firestone from August 6, 1971 until March 2, 1972. The referee also ordered that after March 2, 1972, when plaintiff became disabled at Ford, Firestone's liability to plaintiff would be reduced by one-half (to $51) and Ford's liability would be one-half of the maximum due plaintiff for his disability in its employ ($53.50, one-half of the $107 maximum to which plaintiff was entitled). The referee stated as a rationale for this unorthodox compensation award:

"Under the circumstances, it appears proper and equitable to apportion liability subsequent to March 2, 1972, bringing about a reduction of the liability of Firestone and its insurer to one-half of the maximum rate of $102.00, or $51.00, and to impose upon Ford

Motor Company liability for one-half of what would be its maximum rate for total disability."

Firestone appealed and plaintiff cross-appealed this award to the WCAB. In June, 1975, the WCAB issued its opinion. The board observed that "no legal basis exists for the 'equitable' apportionment of benefits [by the hearing referee] after March 2, 1972", and, further, that "the 'equitable' nature of this approach is open to question since plaintiff actually received less in compensation than he would have had he sought relief solely against defendant Ford ($104.50 per week as opposed to $107.00 per week)". After finding that

"[h]ere the record allows no other conclusion than that, since March 2, 1972, plaintiff has suffered two concurrent total losses of wage earning capacity as the result of two separate and distinct injuries which occurred while concurrently employed by two separate and distinct employers"

The board modified the hearing referee's award, ordering that Firestone should compensate plaintiff at the maximum rate for total disability from August 7, 1971 "until further order of the Bureau" and that Ford should compensate plaintiff at the maximum rate for total disability from March 3, 1972 until October 17, 1973, when, according to the stipulation noted *supra,* plaintiff returned to "favored work" at Ford.[4]

Firestone appealed the WCAB decision solely on the question of whether the board awarded compensation against Firestone at the correct rate. In October, 1975, the Wayne County Circuit Court

[4] The WCAB awarded plaintiff partial compensation for the period November 5, 1973 to November 25, 1973 because during this period he did not earn wages equal to or greater than he was earning in March 2, 1972. See also, fn 2, *supra.*

entered judgment against Ford pursuant to the WCAB order. Ford appealed this judgment. Ford had also filed a delayed application for leave to appeal the WCAB order and a motion to consolidate this delayed application for leave to appeal with its appeal from the circuit court's judgment. In November 1975, the Court of Appeals granted both Ford's delayed application for leave to appeal and its motion to consolidate, *i.e.,* the Court of Appeals consolidated Ford's appeal from the circuit court's judgment and its appeal from the WCAB order vis-à-vis Ford.[5]

On December 13, 1975, plaintiff Hairston died. His widow was substituted as party plaintiff.

In August, 1976, the Court of Appeals affirmed the decision and order of the WCAB. Defendants Ford and Firestone appealed. This Court granted leave on April 22, 1977.

─────────

[5] Our relatively detailed discussion of the appeals Ford made from the WCAB order and the circuit court judgment is necessitated by plaintiff's argument that:

"Ford does not question the validity of that judgment here. The time limit provided for perfecting appeal to this Court from the affirmation by the Court of Appeals of this judgment has passed. Therefore, plaintiff's entitlement to the monies awarded by the Appeal Board as against Ford is not really an issue here.

"Ford apparently asks this Court for an advisory opinion as to the correctness of the decision of the Court of Appeals and the Workmen's Compensation Appeal Board * * *."

We reject this argument. We agree with defendant Ford's response that:

"Defendant properly appealed both the Circuit Court judgment and the Workmen's Compensation Appeal Board Order to the Court of Appeals which consolidated the cases. Defendant then applied for leave to appeal in this Court on both cases. This Court granted leave on both case numbers 25910 and 26291.

"It is errant *[sic]* nonsense for plaintiff to represent to this Court that defendant Ford Motor Company is not properly before it, has no stake in the outcome of this litigation, and cannot appeal the verdict of the circuit court."

## II

Because there are two defendants in this case, the issue is two-fold. We must determine:

(1) whether the WCAB erred in ordering defendant Firestone to compensate plaintiff at the maximum rate for total disability from August 7, 1971 until December 13, 1975;[6]

(2) whether the WCAB erred in ordering defendant Ford to compensate plaintiff at the maximum rate for total disability from March 2, 1972 until October 17, 1973 (when, according to stipulation between plaintiff and defendant Ford, plaintiff returned to "favored work" at Ford).

We begin our discussion of this issue by reiterating the findings of fact made by the WCAB. We emphasize, as did the Court of Appeals, that in the absence of fraud these findings are conclusive. Const 1963, art 6, § 28; MCL 418.861; MSA 17.237(861).

The WCAB, after careful review of the record, found that plaintiff suffered two separate injuries. With respect to defendant Firestone the board found:

"[P]laintiff became disabled on August 6, 1971, because the heavy work which plaintiff had performed for defendant Firestone accelerated the progression of his pre-existing heart condition to the point of total disability from performing his full time job at Firestone on that date."

With respect to defendant Ford, the board found that "plaintiff suffered a single event injury [a heart attack] on March 2, 1972, which disabled him from his * * * full-time employment with defendant Ford".

---

[6] As indicated *supra,* plaintiff died on December 13, 1975. The question of benefits under a "death claim" is not at issue in this case.

The board summarized its findings of fact as follows:

"Here the record allows no other conclusion than that, since March 2, 1972, plaintiff has suffered two concurrent total losses of wage earning capacity as the result of two separate and distinct injuries which occurred while concurrently employed by two separate and distinct employers."

Our first question is whether, in light of these findings, the WCAB erred in ordering Firestone to compensate plaintiff at the maximum rate for total disability from August 7, 1971 until December 13, 1973.

Our answer is no.

Plaintiff's totally disabling injury at Firestone, described *supra,* is clearly a "personal injury" under MCL 418.401(c); MSA 17.237(401)(c).[7] The compensation to which plaintiff is entitled for his injury is determined by MCL 418.351(1); MSA 17.237(351)(1) and MCL 418.355; MSA 17.237(355).[8]

We next ask whether the WCAB erred in ordering Ford to compensate plaintiff at the maximum rate for total disability from March 2, 1972 until October 17, 1973.

Our answer is, as with defendant Firestone, no.

As stated *supra,* the WCAB found, as a matter

---

[7] MCL 418.401(c); MSA 17.237(401)(c) provides:

" 'Personal injury' shall include a disease or disability which is due to causes and conditions which are characteristic of and peculiar to the business of the employer and which arises out of and in the course of the employment."

[8] MCL 418.351(1); MSA 17.237(351)(1) provides in pertinent part:

"While the incapacity for work resulting from the injury is total, the employer shall pay, or cause to be paid as hereinafter provided, to the injured employee, a weekly compensation of 2/3 of his average weekly wages, but not more than $64.00 * * *."

Under MCL 418.355; MSA 17.237(355), plaintiff is entitled to compensation higher than the maximum stated in § 351.

of fact, that plaintiff suffered a "single event injury" at Ford on March 2, 1972. Accordingly, plaintiff is entitled to compensation from Ford (see MCL 418.301[1]; MSA 17.237[301][1]), the amount of which is determined by MCL 418.351(1); MSA 17.237(351)(1) and MCL 418.355; MSA 17.237(355).[9]

### III

Both defendants argue against this conclusion. At bottom they assert that plaintiff had only one "wage-earning" capacity because the Firestone and Ford jobs were "similar" or "in the same line of work".

Defendant Ford argues, under the so-called "similarity test", that earnings in concurrent employments may be considered as a unity in establishing "wage earning capacity" if the employments are "related" or "similar". 2 Larson on Workmen's Compensation Law, § 60.31. Both defendants also rely on *Wolanin v Chrysler Corp,* 304 Mich 164, 172; 7 NW2d 257 (1943), which states:

> "Our statute does not provide for concurrent compensation for total disability *in the same line of work."* (Emphasis added.)

We find these arguments irrelevant. This Court

---

[9] MCL 418.301(1); MSA 17.237(301)(1) provides:

"An employee, who receives a personal injury arising out of and in the course of his employment by an employer who is subject to the provisions of this act, at the time of such injury, shall be paid compensation in the manner and to the extent provided in this act, or in case of his death resulting from such injuries the compensation shall be paid to his dependents as defined in this act. Time of injury or date of injury as used in this act in the case of a disease or in the case of an injury not attributable to a single event shall be the last day of work in the employment in which the employee was last subjected to the conditions resulting in disability or death."

See fn 8, *supra,* with respect to the amount of compensation due plaintiff under §§ 351 and 355 of the act.

does not recognize the "similarity rule". *Lahay v Hastings Lodge,* 398 Mich 467; 247 NW2d 817 (1976), especially fn 8 at 479.

Furthermore, as noted *supra,* the WCAB found as a matter of fact that plaintiff had two separate earning capacities.

## IV

One final observation: in addition to the above stated "legal" bases for our decision, we add that the "equities" in this case favor plaintiff. As the controlling opinion of the WCAB declared, the "equitable nature" of the hearing referee's approach "is open to question since plaintiff actually received less in compensation than he would have had he sought relief solely against defendant Ford ($104.50 per week as opposed to $107.00 per week)". Also, as the concurring opinion of the WCAB forcefully and correctly argued in light of general worker's compensation principles:

"If, for purposes of analysis, we assume that plaintiff worked at Firestone and someone else ('Joe') held plaintiff's job at Ford, what results would occur if we assume the same injuries? Both plaintiff and 'Joe' would each receive compensation due them. Each would suffer a separate personal injury according to the dictates of Section 301.

"Then, the question should be asked, should a different result occur merely because plaintiff holds down two full-time jobs with two different and unrelated employers neither of whom have any connection with the other? Logically and legally the answer seems to be no. Both plaintiff and defendants are subject to the same act and no compelling reason appears which would call for a different result. Defendants are in no worse position than if they had hired two employees and not plaintiff alone. The only one who seems to be reaping a windfall by way of the occurrence of the

personal injuries is plaintiff. But plaintiff is not reaping a windfall. He has received two hurts, each of which have resulted in the loss of his two wage-earning capacities. Plaintiff is entitled to two whole awards of compensation—one from Firestone and one from Ford. Under the facts, this cannot be called a windfall. He merely obtains what Section 301 says he should have."

V

For the reasons articulated *supra,* we affirm the Court of Appeals and WCAB decisions.

Costs to plaintiff.

KAVANAGH, C.J., and LEVIN, RYAN, and BLAIR MOODY, JR., JJ., concurred with WILLIAMS, J.

COLEMAN, J. We are presented with the question of whether the Worker's Disability Compensation Act of 1969 (the act), MCL 418.101 *et seq.;* MSA 17.237(101) *et seq.,* provides maximum compensation for total disability from each employer when a claimant suffers separate injuries in concurrently held employments. The Workmen's Compensation Appeal Board (WCAB) awarded maximum benefits for total disability from each employer on the basis that plaintiff lost two different wage-earning capacities as a result of two distinct job-related injuries. The Court of Appeals affirmed.

We also affirm but for different reasons. The case essentially concerns the proper amount of benefits owed by each employer. There is no question of entitlement, only a dispute as to amount.

Prior decisions of this Court have held that the aggregate amount of benefits receivable in any given period of time, regardless of the number of separate disabling injuries arising from different occupational accidents, was limited by the statu-

tory maximums of §§ 351[1] and 361[2] and previous versions thereof.[3] In order to circumvent this interpretation of the compensation laws, subsequent cases engrafted the exception that multiple awards (the total of which exceeded the statutory limits) were allowable if more than one "wage-earning capacity" was affected.[4] Such a finding also has given birth to other artificial criteria.

The WCAB, in its opinion below, expressed its disagreement with these interpretations and referred to Member Storie's exhaustive analysis in his dissent in *Gismondi v Darin & Armstrong, Inc,* 1975 WCABO 599. After much reflection and

---

[1] MCL 418.351; MSA 17.237(351) reads, in pertinent part:

"(1) While the incapacity for work resulting from the injury is total, the employer shall pay, or cause to be paid as hereinafter provided, to the injured employee, a weekly compensation of 2/3 of his average weekly wages, but not more than $64.00, if such injured employee has no dependents; $69.00 if 1 dependent; $75.00 if 2 dependents; $81.00 if 3 dependents; $87.00 if 4 dependents; and $93.00 if 5 or more dependents; except as provided in section 355. Compensation shall be paid for the duration of the disability. Weekly payments shall not be less than $27.00 if there are no dependents; $30.00 if 1 dependent; $33.00 if 2 dependents; $36.00 if 3 dependents; $39.00 if 4 dependents; and $42.00 if 5 or more dependents; except as provided in section 355. Compensation shall be paid for the duration of the disability. * * *"

[2] MCL 418.361; MSA 17.237(361) reads, in pertinent part:

"(1) While the incapacity for work resulting from the injury is partial, the employer shall pay, or cause to be paid to the injured employee a weekly compensation equal to 2/3 of the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter, but not more than $64.00 if such injured employee has no dependents; $69.00 if 1 dependent; $75.00 if 2 dependents; $81.00 if 3 dependents; $87.00 if 4 dependents; and $93.00 if 5 or more dependents; except as provided in section 355. Compensation shall be paid for the duration of the disability. * * *"

[3] *E.g., O'Brien v Albert A Albrecht Co,* 206 Mich 101; 172 NW 601 (1919), *Magnuson v Oliver Iron Mining Co,* 270 Mich 482; 259 NW 317 (1935), *Wolanin v Chrysler Corp,* 304 Mich 164; 7 NW2d 257 (1943), *Harrison v Lakey Foundry Co,* 361 Mich 677; 106 NW2d 521 (1960).

[4] *E.g., Hebert v Ford Motor Co,* 285 Mich 607; 281 NW 374 (1938), *Wolanin, supra, Harrison, supra, Tidey v Riverside Foundry & Galvanizing Co,* 7 Mich App 40; 151 NW2d 198 (1967), aff'd 381 Mich 551; 164 NW2d 3 (1969), *Thumser v Lakey Foundry Corp,* 84 Mich App 319; 269 NW2d 583 (1978).

study, we are convinced that the maximum limits of §§ 351 and 361 should be applied only to the results of each specific occupational accident.[5] The plain wording of the statute must be given meaning. Compensation should be available for the effects of an occupational accident without consideration of the benefits being provided (or available) as a result of a different occupational accident, unless consideration of other benefits is compelled by § 371(1).[6] Section 371(1) reads in pertinent part:

[5] We are aware that the statute refers to the results of a particular "injury" rather than a particular "accident". In the situation where an occupational accident results in several injuries, no one would seriously contend that separate compensation should be provided for each injury. Rather, benefits are provided for the total result of the accident—the "incapacity to work"—and they continue for the duration of the disability. See, generally, *Bommarito v Fisher Body Corp,* 273 Mich 1, 4; 262 NW2d 329 (1935).

We do not mean to suggest, however, that multiple maximum awards are available for injuries arising from one employment, just because the origins of the injuries are unrelated. Our holding only applies to cases where multiple employments are involved, although multiple employments can be created when performance of one job is interrupted by an occupational injury and the worker subsequently returns to that job. If the injuries occur in the same employment, and are unrelated but concurrent, for example, there is no basis for a double recovery. See, generally, *Tidey v Riverside Foundry & Galvanizing Co,* 7 Mich App 40; 151 NW2d 198 (1967), *aff'd* 381 Mich 551; 164 NW2d 3 (1969). See, also, *Harrison v Lakey Foundry Co,* 361 Mich 677; 106 NW2d 521 (1960).

[6] MCL 418.371; MSA 17.237(371) reads:

"(1) The weekly loss in wages referred to in this act shall consist of such percentage of the average weekly earnings of the injured employee computed according to the provisions of this section as shall fairly represent the proportionate extent of the impairment of his earning capacity in the employment in which he was working at the time of the injury, the same to be fixed as of the time of the injury, but to be determined in view of the nature and extent of the injury. *The compensation payable, when added to his wage earning capacity after the injury in the same or another employment, shall not exceed his average weekly earnings at the time of such injury.*" (Emphasis added.)

The language emphasized above has been held to apply only to replacement or successive employment and not to concurrent employment. *Lahay v Hastings Lodge No 1965 BPOE,* 398 Mich 467; 247 NW2d 817 (1976), *Bowles v James Lumber Co,* 345 Mich 292; 75 NW2d 822 (1956). Thus, § 371(1) would require a set-off in the successive employment circumstances which would obviate any incentive to malinger caused by our holding today.

"'* * * The compensation payable, when added to his wage earning capacity after the injury in the same or another employment, shall not exceed his average weekly earnings at the time of such injury."

Furthermore, we abandon the use of the concept of "wage-earning capacity"[7] as an analytical tool in such circumstances. To the extent that prior decisions of this Court are inconsistent with this opinion, those decisions are overruled.

I

Factually, this case presents a compelling argument for our decision today. Claimant worked a minimum of 40 hours per week for Ford Motor Company (Ford) from June 27, 1948 to March 2, 1972. He also worked 48 hours per week at Firestone Tire & Rubber Company (Firestone) from 1955 to August 6, 1971. For a period of 16 years claimant had worked a minimum of 88 hours per week for two employers. We note that the current economic situation has forced many other Michigan citizens also to hold a second job, be it either on a full- or part-time basis. Thus, these facts are not so unique as one might initially think.

The record reflects that claimant's duties at both employments involved physical labor. At Firestone, Mr. Hairston changed (both in the store and on the road) and stacked tires with weights varying between 25 and 300 pounds (bus, truck, and

[7] We use the phrase "wage-earning capacity" concept to refer to the legal theory that a person may have multiple wage-earning capacities. Under this theory, different earning capacities are established by holding different types of jobs or jobs in different "lines of work". If a claimant establishes different wage-earning capacities then, under this theory, benefits resulting from separate occupational accidents are not aggregated when computing the statutory maximum. See, *e.g.,* the cases cited in footnotes 3, 4, *supra.* It is this contrived analytical concept which we reject.

automobile tires). He also unloaded and stacked lawn mowers, stoves and refrigerators weighing as much as 600 pounds.

Claimant's duties at Ford were less strenuous but not necessarily characteristic of light work. Although his previous duties at Ford were more exacting, for the last seven or eight years claimant worked as a janitor-cleaner. He dusted, emptied ashtrays and wastebaskets, cleaned restrooms and scrubbed floors with a machine. The wastebaskets were usually full of IBM cards and weighed approximately 50 pounds when full. These wastebaskets, as well as auto parts weighing up to 40 pounds each, had to be carried and thrown nine or ten feet upwards into the top of a Dumpster. Plaintiff also operated the scrubbing machine, which weighed 2000 pounds, two or three days per week for about three hours at a stretch. He had to struggle to maneuver the scrubber in the shop area.

As a result of rheumatic fever and arteriosclerosis, claimant had a non-occupationally created heart condition. After Mr. Hairston had undergone an examination of his heart,[8] Firestone requested a copy of the medical report. Because it was believed that his heart was not strong enough for him safely to continue his duties, plaintiff was discharged from his job at Firestone. His last day of work there was August 6, 1971, but he still continued to work at Ford. While struggling with the scrubbing machine, plaintiff suffered a heart attack at Ford on March 2, 1972.

---

[8] At some time prior to 1971, plaintiff discovered that he had a heart problem. The record is not clear as to exactly when this knowledge was acquired or if either defendant had prior knowledge of plaintiff's condition. It appears that Firestone learned that plaintiff was being extensively examined at University Hospital in Ann Arbor and requested a copy of the medical report.

During October of 1971, plaintiff had filed a workmen's compensation claim against both Firestone and Ford. His petition against Ford was amended in March of 1972 following his heart attack. On January 17, 1973, the hearing referee found that as a result of the aggravation of claimant's preexisting heart condition by his work at Firestone, Mr. Hairston became totally disabled as of August 6, 1971. The referee further found that as a result of the aggravation of his underlying condition by his duties at Ford, claimant suffered a totally disabling single-event injury (the heart attack) on March 2, 1972. Firestone was ordered to pay $102 per week (the statutory maximum based on an average weekly wage of $174.20 and four dependents) from August 7, 1971 to March 2, 1972. Thereafter, benefits from Firestone were reduced to $51 per week. Ford was ordered to pay $53.50 per week (50 percent of the statutory maximum based on an average weekly wage of $175 and four dependents) from March 3, 1972. The referee's apportionment presumably was based on the statutory maximums and a belief that each job contributed equally to plaintiff's ultimate condition.

Firestone appealed to the WCAB and the plaintiff cross-appealed. On June 20, 1975, the WCAB rejected the referee's "equitable" apportionment of benefits and awarded compensation against each defendant at the maximum rate.[9] The factual basis for this decision was that:

"Here the record allows no other conclusion than

[9] Firestone was ordered to pay $102 per week from August 7, 1971 until further order of the WCAB. Ford was ordered to pay $107 per week from March 3, 1972 to October 17, 1973 and compensation for partial disability from November 5, 1973 to November 25, 1973. Beginning October 17, 1973, and except for the period in November of 1973, plaintiff returned to favored work at Ford at wages equal to or greater than the wages he was earning on March 2, 1972.

that, since March 2, 1972, plaintiff has suffered two concurrent total losses of wage earning capacity as the result of two separate and distinct injuries which occurred while concurrently employed by two separate and distinct employers."

Both Firestone and Ford[10] appealed this decision to the Court of Appeals. On December 13, 1975, Mr. Hairston died and his widow was substituted as the party plaintiff. The Court of Appeals affirmed the WCAB.

## II

The focus of the arguments in our Court has been upon the legal implications of "wage-earning capacity" and their application to these facts. In the situation where a worker is disabled from two concurrently held employments as a result of different occupational accidents, we see no reason in law or policy for distinguishing between plaintiffs on the basis of wage-earning capacities. The only utility of such an arbitrary and amorphous concept is to avoid this Court's harsh construction of the application of the statutory maximum in such circumstances. Because we believe those sections of the act were misconstrued in 1919, we see no further benefit to be derived from compounding the subsequent creativity deemed necessary to read into the statute the concept of wage-earning capacities.

The holding that the statutory maximums apply to the aggregate benefits available from multiple

---

[10] Ford did not appeal to the WCAB and a judgment was taken against it in circuit court pursuant to the WCAB order. Ford filed an appeal of this judgment and a motion for delayed appeal from the WCAB order with the Court of Appeals. The Court of Appeals consolidated both of Ford's appeals with Firestone's appeal and heard the cases together. We granted leave to appeal in both cases. On this record, we reject plaintiff's argument that Ford has not properly preserved all of its issues presented on appeal.

accidents in any given period of time was first set forth in *O'Brien v Albert A Albrecht Co,* 206 Mich 101; 172 NW 601 (1919), and most recently given consideration in *Jones v Cutler Oil Co,* 356 Mich 487; 97 NW2d 74 (1959), and *Harrison v Lakey Foundry Co,* 361 Mich 677; 106 NW2d 521 (1960).[11] Between 1919 and 1959, this Court created the "wage-earning capacity" concept as a means of circumventing *O'Brien. E.g., Hebert v Ford Motor Co,* 285 Mich 607; 281 NW 374 (1938), *Wolanin v Chrysler Corp,* 304 Mich 164; 7 NW2d 257 (1943).

The statute at issue in *O'Brien* was markedly similar to the language of §§ 351 and 361.[12] Sections 351 and 361 now begin:

---

[11] The *Jones* and *Harrison* cases present an unusual precedent. Justice CARR's opinions in the cases follow the *O'Brien* view—in any given period of time no claimant may receive more benefits than those prescribed by the statutory maximums. Justice SMITH would provide maximum compensation for the results of each injury. Justice SMITH's approach prevailed in *Jones* on the basis of a 4 to 4 affirmance. The next year Justice CARR's view won a 5 to 3 majority.

Various reasons could be given to explain these seemingly inconsistent decisions—*e.g.,* a change in the membership of the Court, general versus schedule disability benefits, one employer versus two employers. Regardless of whether the two cases are reconcilable, however, we believe that both results were proper under our present interpretation of the law. Pursuant to the interplay of §§ 351, 361 and 371(1), we would have reached the same results today although for different reasons.

[12] The claimant in *O'Brien* suffered disabling injuries as a carpenter while working for two successive employers. He received compensation for total disability from the first injury ($9.45 per week), but it was reduced to partial disability benefits of $7 per week as he recovered. While still receiving those benefits, claimant suffered his second injury and was awarded $10 per week for total disability from the second employer. The second employer successfully argued that because the statutory maximum was $10 per week, claimant could not receive $7 from the first employer and $10 from it simultaneously. It was held that:

"Both injuries occurred while plaintiff was following his trade as a carpenter. His disabilities are disabilities to continue in that line of employment. * * * It must be obvious that a man cannot be more than totally disabled. It should be equally obvious that he cannot receive compensation for more than total disability. Our statute does not provide for concurrent compensation. It fixes a maximum for total disability of $10 per week, and it cannot exceed that sum whether it is paid by one employer or by several." 206 Mich 101, 106.

"While the *incapacity for work resulting from the injury* is * * * [total or partial], *the employer shall pay,* * * * to the injured employee, a weekly compensation * * *, but not more than * * * [specified limits depending upon the number of dependents]. Compensation shall be paid for the duration of the disability." MCL 418.351, 418.361; MSA 17.237(351), 17.237(361). (Emphasis added.)

The plain words of the act provide compensation for the results of a specific occupational injury (accident)[13] and make no reference to the results of other accidents. The usage is singular and not plural. Each employer is statutorily responsible for the incapacity to work and earn wages caused by an occupational injury. There is no legislatively created mechanism for limiting the benefits Mr. Hairston would receive from Ford because he was previously entitled to receive compensation from Firestone. Furthermore, there is nothing in the sections which even suggests that results would vary depending upon the "wage-earning capacity" involved.

Although the *Harrison* case involved altogether different facts, we find the observations of Justice

---

Much of the subsequent interpretation resulted from this language. However, we find no basis in the statute at issue in *O'Brien* for that Court's holding. The language was markedly similar to §§ 351 and 361 and read:

"*While the incapacity for work resulting from the injury* is total, the employer shall pay, * * * to the injured employee a weekly compensation equal to one-half his average weekly wages, but not more than ten dollars nor less than four dollars a week; * * *." 1915 CL 5439. (Emphasis added.)

[13] The need for distinguishing between the results of one injury caused by one accident and the results of multiple injuries also caused by one accident is explained in footnote 5, *supra*.

Smith's dissenting opinion pertinent. Referring to a nearly identical statute,[14] he wrote:

"Does the above, as defendant argues, mean that 'the maximum payable *for any and all injuries*' shall be only so much? If so, only the first accident need be paid for. The next is free. Or does it, as plaintiff argues, mean that 'the maximum payable *for any one injury*' shall be as specified? If this is its meaning, then no covered disability shall be without compensation, whether it runs concurrently with another or not." 361 Mich 677, 682.

Subject to the set-off mandated by § 371(1), the analysis above is applicable whenever the claimant suffers two separate injuries. It is particularly relevant to the facts of this case.

The effects of the *O'Brien* construction are inequitable and contrary to the purposes of the act when applied to the case at bar. As noted by the concurrence to the WCAB opinion below, if benefits from both Firestone and Ford are aggregated when computing the maximum compensation allowable, the result is to provide the employers with a windfall simply because Mr. Hairston was injured twice, once in each of two separate employments.[15]

---

[14] That statute, a predecessor to § 351, read:

"While the incapacity for work resulting from the injury is total, the employer shall pay, * * * to the injured employee, a weekly compensation of 66-2/3% of his average weekly wages, but not more than * * * [specified maximums varying with the number of dependents] * * *." 1948 CL 412.9.

[15] Member Oldstrom's concurring opinion below explains:

"If, for purposes of analysis, we assume that plaintiff worked at Firestone and someone else ('Joe') held plaintiff's job at Ford, what results would occur if we assume the same injuries? Both plaintiff and 'Joe' would each receive compensation due them. Each would suffer a separate personal injury according to the dictates of § 301.

"Then, the question should be asked, should a different result occur merely because plaintiff holds down two full-time jobs with two different and unrelated employers neither of whom have any connec-

Opinion by COLEMAN, J.

It is also inconsistent with the purposes of workmen's compensation legislation to follow the *O'Brien* interpretation where occupational accidents occur at concurrently held jobs. The act contemplates that a worker should receive compensation for the impairment of future earning capacity occasioned by an occupational injury. Actual wage loss is used as the gauge of impairment of earning capacity. See, generally, 2 Larson, Workmen's Compensation Law, §§ 57.10, 57.20.

Assuming that a claimant's pre-injury wage level is comprised of earnings from jobs *A* and *B,* if an injury in job *A* affects only job *A* wages, then claimant would be entitled to benefits from job *A* plus job *B* wages. If claimant receives a *second injury* at job *B,* we find him entitled to benefits from job *B* regardless of whether the total benefits from jobs *A* and *B* exceed the statutory maximum. Claimant has suffered *two injuries* and has lost two separate parts of his established earning capacity. This approach does not work any hardship upon employers and provides the disabled worker with just compensation. As can be gleaned from a close reading of the act, the key to resolving the situation is the fact that two different injuries are involved. Sections 351 and 361 refer to "the injury" for which "the employer" shall provide compensation.

---

tion with the other? Logically and legally the answer seems to be no. Both plaintiff and defendants are subject to the same act and no compelling reason appears which would call for a different result. Defendants are in no worse position than if they had hired two employees and not plaintiff alone. The only one who seems to be reaping a windfall by way of the occurrence of the personal injuries is plaintiff. But plaintiff is not reaping a windfall. He has received two hurts, each of which have resulted in the loss of his two wage-earning capacities. Plaintiff is entitled to two whole awards of compensation— one from Firestone and one from Ford. Under the facts, this cannot be called a windfall. He merely obtains what § 301 says he should have."

### III

Although rejection of the *O'Brien* approach renders the "wage-earning capacity" concept superfluous, we discern several other contrived criteria calling for its abandonment. While multiple wage-earning capacities have been found to exist on the basis of skilled and unskilled employment, *e.g., Hebert v Ford Motor Co,* 285 Mich 607; 281 NW 374 (1938), *Thumser v Lakey Foundry Corp,* 84 Mich App 319; 269 NW2d 583 (1978), fact finders have also looked to whether the same "lines of work" were involved. *E.g., Wolanin v Chrysler Corp,* 304 Mich 164; 7 NW2d 257 (1943), *Tidey v Riverside Foundry & Galvanizing Co,* 7 Mich App 40; 151 NW2d 198 (1967), *aff'd* 381 Mich 551; 164 NW2d 3 (1969). The WCAB below made a finding that plaintiff's duties at Firestone and Ford constituted different lines of work, although arguably the only discernible material difference was the degree of effort required.

Although the skilled-unskilled dichotomy is a workable if illogical basis for distinguishing claimants, the WCAB determination below only accentuates the arbitrary nature of the concept. It suggests that the existence of multiple wage-earning capacities is dependent upon the nature of the duties of a particular employment. Continued utilization of this concept has led to arbitrary decisions on the part of the referees and the WCAB because it does not provide means for fairly distinguishing fact situations.[16] Furthermore, lawyers and decision-makers have been (and are in this case) involved in hairsplitting arguments over the relative

---

[16] We also cannot embrace the skilled-unskilled division. Within each category there are occupations characterized by duties which are so different that they would require different treatment.

similarities and dissimilarities between jobs, especially those requiring degrees of physical exertion.

It is noted that this Court recently rejected the "similarity" test for resolving the situations where there is *one* disabling injury and two concurrent employments. *Lahay v Hastings Lodge No 1965 BPOE,* 398 Mich 467, 479, fn 8; 247 NW2d 817 (1976). Wages from both jobs are now considered when computing benefits only if the injury "affects" the second "earning capacity". Work similarity has no more relevance to whether the benefits from injuries in concurrent employments should be aggregated when computing the statutory maximum than it does in the *Lahay* situation.

## IV

In summary, our holding today concerns situations where multiple occupational accidents affect a worker's capacity to perform in multiple employments. Those employments may be concurrent or successive and involve one or more employers without changing this analysis. Successive employments, even if at the same job, would require compliance with the set-off provision of § 371(1); yet, our construction of §§ 351 and 361 would still be applicable.[17]

This construction is also consistent with the purposes of disability compensation and is justified on the basis of fairness to all parties. No unjust burden is placed upon employers or the consuming public and workers are given more equitable treatment. The interpretation above employs a more

---

[17] We see no reason for a different result had Mr. Hairston worked each job for the same employer. There would be, however, a different result if he had worked the same job 16 hours per day or if one injury had disabled him from both jobs. The crucial variance in those situations would be that only one accident would be involved, rather than two accidents as in the case at bar.

literal reading of the act than that of *O'Brien* and its progeny and is likely to curtail progressively creative circumvention of illogical precedent. The possibility of arbitrary and inconsistent applications is reduced. Judicial juggling and contrived exceptions, such as the multiple wage-earning capacities concept, are no longer necessary to achieve a fair result.[18]

It is also noteworthy that our decision today will not induce workers to malinger. See, generally, 2 Larson, Workmen's Compensation Law, § 59.41. The disparity between benefits and wages is sufficient to encourage as prompt a recuperation as possible.

We hold, therefore, that a claimant is entitled to compensation for the results of each occupational accident without regard to the benefits available for the effects of a different accident, unless consideration of other benefits and set-off is required by § 371(1).

The WCAB found that plaintiff suffered a distinct job-related injury in each concurrently held employment. Such findings are binding upon us in the absence of fraud. Const 1963, art 6, § 28; MCL 418.861; MSA 17.237(861). Consequently, the Court of Appeals and the WCAB are affirmed as to result, but for a different reason. Prior inconsistent decisions of this Court are overruled effective with this decision which shall be applied prospectively to all cases commenced after this date and

---

[18] A particularly untenable finding in avoidance of *O'Brien* and *Harrison* occurred in *Herrala v Jones & Laughlin Steel Corp,* 43 Mich App 154; 203 NW2d 752 (1972). Claimant had suffered a back injury and a heart attack in separate accidents. He sought benefits for both injuries but the WCAB only awarded benefits for the first injury. Claimant redeemed that award and then refiled for the second injury. The Court of Appeals held that he could recover for the second injury because, as a result of the lump-sum redemption, there was no overlap of weekly payments.

to cases on appeal in which the issue has been preserved.

Affirmed.

FITZGERALD, J., concurred with COLEMAN, J.